**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No.  24-81428-CIV-SMITH**

| | |
|---|---|
| MARK KLOSTER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LILIUM N.V., KLAUS ROEWE, and JOHAN MALMQVIST,<br><br>Defendants. | <u>CLASS ACTION</u><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Lead Plaintiff TLP One LLC ("Lead Plaintiff" or "TLP One"), individually and on behalf of all others similarly situated, by and through undersigned counsel, brings this action against Lilium N.V. ("Lilium" or the "Company"), Klaus Roewe ("Roewe") and Johan Malmqvist ("Malmqvist") (collectively, the "Defendants").  Lead Plaintiff alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's counsel.  The investigation included, but was not limited to, review and analysis of:  (i) public filings of Lilium with the U.S. Securities and Exchange Commission ("SEC"); (ii) conference calls Defendants held with analysts and investors; (iii) wire and press releases published by and regarding the Company; (iv) analyst and media reports concerning Lilium; (v) other public information regarding the Company and its industry; and (vi) interviews with knowledgeable former Lilium employees.  Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity to conduct discovery.

## I.      NATURE OF THE ACTION

1.      This is a class action on behalf of all persons and entities that purchased or otherwise acquired Lilium securities between June 11, 2024 and November 3, 2024, inclusive (the "Class Period").  Lead Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Lilium, together with its consolidated entities, was a start-up aviation company engaged in the research and development of an electric vertical takeoff and landing jet (an "eVTOL") (the "Lilium Jet").  Prior to declaring insolvency, Lilium had been engaged in pre-

order sales of the Lilium Jet as the Company purportedly finalized its design, completed an ongoing certification process, and built out manufacturing capacity.

3.      On October 24, 2024, before the market opened, Lilium suddenly announced that it had been unable to raise sufficient additional funds to continue the operations of the Company's principal operating wholly owned German subsidiaries.  As a result, it reported that the managing directors of the subsidiaries determined that they are overindebted and are, or will, become unable to pay their existing liabilities.  Lilium disclosed that, subject to certain limited exceptions, the Company would lose control of the subsidiaries.

4.      On this news, Lilium's stock price fell $0.33, or 61.6%, to close at $0.21 per share on October 24, 2024, on unusually heavy trading volume.  The Company's stock price continued to fall in the subsequent trading day, falling $0.06, or 28.8%, to close at $0.15 per share on October 25, 2024, on unusually heavy trading volume.

5.      Then, on November 4, 2024, before the market opened, the Company reported that, following the insolvency of the Company's subsidiaries, Lilium had not been able to raise sufficient additional funds to conduct its ongoing business consistent with past practice.  The Company disclosed that "funding for the Company is not feasible."  As a consequence, the Company would be "obliged to file for insolvency."

6.      On this news, Lilium's stock price fell $0.015, or 15.5%, to close at $0.083 per share on November 4, 2024, on unusually heavy trading volume.  The Company's stock price continued to fall in the subsequent trading day, falling $0.031, or 36.97%, to close at $0.052 per share on November 5, 2024, on unusually heavy trading volume.

7.      At the start of the Class Period, Defendants led investors to believe that:  (i) the Company was managing its cash position, (ii) its financing prospects were strong, with

governmental guarantee approvals expected, and (iii) it was on track to develop and fly its first manned flight by late 2024. Defendants touted that the Company had received hundreds of pre-orders for the Lilium Jet, and had achieved numerous developmental milestones. While the Company listed a litany of risk factors associated with its developing business and financing efforts, throughout the Class Period, Defendants concealed the truth about what was actually occurring: that Lilium was experiencing serious supplier delays with Honeywell, Inc. ("Honeywell") and other suppliers that would force the Company to delay its first manned flight; that Lilium was quickly running out of money; that governmental support for loan guarantees was waning, and if those guarantees were not forthcoming, the Company would be forced to declare insolvency.

8. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants: (1) overstated the progress of the Company's fundraising activities; (2) overstated the likelihood and/or feasibility of obtaining sufficient funding to continue operations; (3) failed to disclose that serious supplier issues with key suppliers were occurring throughout 2024 which would result in delay in the first manned flight; (4) failed to disclose that as a result of the first flight delay, the release of significant investment money and needed pre-order payments would not occur in 2024; (5) failed to disclose the imminent insolvency of the Company and its subsidiaries; and (6) failed to disclose that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

9. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

10. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, Lilium's operations in the United States have been based in this District.

13. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

14. Lead Plaintiff TLP One is a Wyoming LLC and a private investment vehicle. Lead Plaintiff acquired Lilium's securities at artificially inflated prices during the Class Period

4

and was damaged upon the revelation of the alleged corrective disclosures. (*See* Amended Certification Pursuant to the Federal Securities Laws and Declaration in Support of the Motion of TLP One LLC for Appointment as Lead Plaintiff and Approval of Selection of Counsel filed on January 28, 2025 (ECF Nos. 49-2 and 49-3, respectively)).

**B.      Defendants**

15.      Defendant Lilium is incorporated under Dutch law with its principal offices located in Gauting, Germany.  Lilium's American subsidiary, Lilium Aviation Inc. is incorporated under Delaware law and maintains its offices at 2385 N.W. Executive Center Dr., Suite 300, Boca Raton, Florida 33431.  Lilium's ordinary shares traded in an efficient market on the NASDAQ under the trading symbol "LILM".

16.      Defendant Roewe served as Lilium's Chief Executive Officer ("CEO") at all relevant times, and as a member of the Company's board of directors.  During the Class Period, Roewe made materially false and misleading statements and failed to disclose material facts to investors as alleged herein.

17.      Defendant Malmqvist served as Lilium's Chief Financial Officer ("CFO") at all relevant times.  During the Class Period, Malmqvist made materially false and misleading statements and failed to disclose material facts to investors as alleged herein.

18.      Defendants Roewe and Malmqvist are sometimes referred to herein as the "Individual Defendants."

19.      The Individual Defendants possessed the power and authority to control the contents of Lilium's SEC filings, press releases, and other market communications, and exercised that control during the Class Period.

5

20.     The Individual Defendants were provided with copies, prior to or shortly after their issuance, of Lilium's SEC filings and press releases alleged herein to be misleading and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

21.     The Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Company Background

22.     Lilium GmbH was founded in 2015 as a start-up company in the field of urban air mobility.  Since its founding, the Company was primarily engaged in research and development of a self-developed eVTOL jet, the Lilium Jet, for production and operation of a regional air mobility service as well as related services.

23.     Qell Acquisition Corp. ("Qell") was formed in October 2020 as a special purpose acquisition company ("SPAC") for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

24.     On March 11, 2021, Lilium was incorporated as a Dutch private limited liability company under the name Qell DutchCo B.V. solely for the purpose of effectuating the business combination of Lilium GmbH, Queen Cayman Merger LLC, a Cayman Islands limited liability company and wholly owned subsidiary of Lilium, Qell, and Lilium.

25.     In connection with the closing of the business combination, on September 10, 2021, Lilium converted into a Dutch public limited liability company.  On September 14, 2021, Lilium

closed the business combination with Qell and Lilium GmbH, and Lilium GmbH became a direct, wholly-owned subsidiary of the Company.

26.     The following graph depicts Lilium's structure as of March of 2024.



27.     Prior to and during the Class Period, Lilium has been engaged in pre-order sales of the Lilium Jet as the Company purportedly finalized its design, completed an ongoing certification process, and built out manufacturing capacity.

**B.      Materially False and Misleading Statements Issued During the Class Period**

28.     The Class Period begins on June 11, 2024.  On that day, Lilium issued a shareholder letter providing a business update for the three-month period ended March 31, 2024, signed by defendants Roewe and Malmqvist and attached to a Form 6-K filed with the SEC.  The shareholder letter touted the Company's strong "*fundraising success,*" "*cash management,*" and "*significant progress on fundraising front.*"[1]   The shareholder letter further touted the strong funding opportunities offered by the Company's receipt of pre-delivery payments.  Specifically, the shareholder letter stated, in relevant part:

---

[1]  Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

**Commercial order book grows**

-Urbanlink orders 20 Lilium Jets, with additional 20 options, including ***customary pre-delivery payment plan***

-eVolare announces binding sale and purchase agreements for 4 Lilium Jets

\*       \*       \*

**Fundraising success**

-Successfully completed fundraise with $114 million gross proceeds

-Due diligence started for intended loan with guarantee from the German Federal Government and the State of Bavaria

-Lilium in advanced discussions with the French government towards a government guarantee-backed loan

\*       \*       \*

Our first test aircraft are advancing well.  Customers like what they see - the spacious cabin, the projected range and unit economics - ***and our pipeline of orders with pre-delivery payments has grown.  Discussions around further funding have also gained traction on multiple fronts, with our successful, recent $114 million gross proceeds capital raise backed by new and existing investors, and significant advances in our funding discussions on government support from France and Germany***.

\*       \*       \*

***On the commercial front, the Lilium Jet order pipeline continues to grow.***  In May, advanced aviation operator Urbanlink purchased 20 Lilium Jets for operation in South Florida.  The order reflects a clear preference for the expected superior performance, range, unit economics and passenger experience offered by the Lilium Jet.  Urbanlink also secured an option for 20 additional Lilium Jets.  In addition, eVolare announced the signing of binding sale and purchase agreements for the acquisition of 4 Lilium Jets and agreed on terms for the reservation of up to an additional 12 Lilium Jet production slots.

In total, Lilium now has an order pipeline of over 780 Lilium Jets including binding orders and Mou agreements from operators in the United States, South America, Europe, Asia, and the Middle East.

***With regard to our cash management, Lilium continues to follow a disciplined approach focused on the delivery of key Lilium Jet program milestones.***  The adjusted cash spend in Q1 2024 of €94.7 million ($102 million) was driven primarily by milestone execution on the Lilium Jet development and related

8

supplier expenses, especially in connection with the start of production of the first Lilium Jet at the end of 2023. Lilium's adjusted cash spend tor the first half of 2024 is now expected to be €185 - € 195 million ($200 - $211 million).  At the end of the quarter and prior to the fundraising arranged in May, Lilium's unaudited liquidity totaled €102 million ($110 million).

At the end of May, Lilium concluded a $114 million gross proceeds capital raise backed by new and existing investors.

Also in May, the German Federal and Bavarian State governments commissioned the state-owned development bank KfW to conduct due diligence on Lilium as part of their customary investment process.  ***Once the diligence is completed, Lilium expects to receive guarantees from the Federal Government and the State of Bavaria as security for a loan from the German state bank.  Lilium expects due diligence will take around 6 to 8 weeks and a funding amount of around €100 million.***

***In addition, Lilium confirmed that it is in advanced discussions towards a French government guarantee-backed loan, which would be non-dilutive from a financing perspective.  Lilium estimates this funding will be around €200 million*** with the disbursements tied to investment by Lilium to develop and expand its industrial footprint in France.  Lilium plans to use the funding to build high-volume production facilities in France, including a final assembly line, a battery pack assembly line and maintenance facilities.

Lilium continues to engage in active dialogue with sovereign entities, strategic partners, prospective customers and stakeholders for further funding initiatives.

*     *     *

***In summary, we continue to deliver our key milestones as we progress to our first manned flight, targeted to occur in late 2024 and entry into service targeted for 2026.***

*     *     *

On the commercial front the superior expected performance, unit economics and comfort provided by the Lilium Jet has resulted in around ***56 firm orders, and we continue to convert MOUs into firm orders with pre-delivery payments.***

*     *     *

**Significant progress on fundraising front**

***During the past few months, Lilium made significant progress on its fundraising efforts, primarily on three fronts.  First, Lilium concluded a $114 million gross proceeds capital raise, backed by both new and existing investors.***

9

***Second, Lilium made a significant advance in its funding discussions*** with its home state of Bavaria and the German government.  Bavaria and the German government have commissioned the state bank KfW to conduct due diligence on Lilium as part of the customary investment process.

***Once the diligence is completed, Lilium expects to receive guarantees from the Federal Government and the State of Bavaria as security for a loan from the German state bank.***  Lilium expects due diligence will take around 6 to 8 weeks and a funding amount of around 100 million euros which could be in the form of a convertible note.

***Finally, Lilium is in advanced discussions with the French government towards a government guarantee-backed loan, which would be non-dilutive from a financing perspective***.  Lilium estimates this funding will be around 200 million euros with the disbursements tied to investment by Lilium to develop and expand its industrial footprint in France.

Lilium plans to use the funding to build high-volume production facilities in France, including a final assembly line, a battery pack assembly line and maintenance facilities.  Lilium is currently discussing potential locations for the facilities with French regional governments.  Lilium's headquarters, initial production line, R&D center, and propulsion center will remain at the current location near Munich.

***In addition, Lilium continues to engage in active dialogue with sovereign entities, strategic partners, prospective customers and stakeholders for further funding initiatives.***

*       *       *

**Cash status and guidance**

***At the end of the quarter and prior to the latest funding, Lilium's unaudited liquidity totaled €102 million ($110 million).***  Lilium cash spend in Q1 2024 was driven primarily by significant milestone execution on Lilium Jet development and related supplier expenses, especially in connection with the start of production of the first Lilium Jet at the end of 2023.  Lilium's adjusted cash spend in the first quarter amounted to €94.7 million ($102 million).  The cash spend was also driven by phasing of supplier expenses carried over from the end of 2023.  ***Looking ahead, Lilium will continue to follow a prudent cash management approach supporting execution of key Lilium Jet program milestones***.  Lilium's adjusted cash spend for the first half of 2024 is expected to be €185 - €195 million ($200 - $211 million).

Looking ahead to the remainder of 2024, we expect 2nd half adjusted cash spend to be slightly higher than the 1st half, driven primarily by higher spending within our supply chain, as we begin taking delivery of the various systems and components needed for assembly of our first Lilium Jet aircraft that are now on the production line.

10

We also increased our headcount faster than originally planned, due to successful hiring of highly qualified engineering talent earlier than anticipated.

29.     The shareholder letter also emphasized the progress being made on the first Lilium Jet, stating, in relevant part:

> *At Lilium, our engineering and manufacturing teams are currently working full speed to achieve our next critical milestone:  first piloted flight of the Lilium Jet, targeted for the end of this year*.  In April, we started production of our aviation-grade battery packs, a key program milestone for the year. *The first Lilium Jet (MSN-1) continues to make good progress on the final assembly line*.  Fuselage, wings and canards of our second Lilium Jet, MSN·2, have been completed by our aerostructures suppliers and the fuselage was delivered to Lilium in May.

*      *      *

> We are well into assembly of our first Lilium Jet and plan to continue to provide updates on our progress as we go through the rest of the year.

*      *      *

> *During the first quarter of 2024, major aircraft structures and systems continued to arrive at Lilium from our suppliers, enabling Lilium to advance aircraft build and verify quality and interfaces for the first set of Lilium Jets*.

*      *      *

11



30.     On June 11, 2024, the Company also held an earnings call regarding its financial results for its fiscal first quarter ended March 31, 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, defendant Roewe touted that the Company's "*order pipeline is growing and we've made significant funding progress*," including that the Company's pre-delivery payments were providing substantial funding, stating that "[o]n the financing front *we have already begun receiving customary collection of pre-delivery payments in connection with pre-orders*." Defendant Malmqvist further assured investors that the Company had "*made significant progress on our fundraising efforts*" and that "*customary pre-delivery payments will provide an additional support around our longer-term funding plan*." Specifically, during the 1Q24 Earnings Call, the following statements were made, in relevant part:

<Klaus Roewe>

*Lilium already has orders and MOU agreements from premium and airline customers.* Ladies and gentlemen, I think it is important to take note of these five

12

differentiating factors that set Lilium apart.  ***And I would like to highlight the significant strides we have taken these past few months.  The momentum continues.***  Our first test aircraft are well advancing.  ***Our order pipeline is growing and we've made significant funding progress.  We have our next key milestones, first piloted flight, firmly on our sights.***

Let me take you through the highlights***.  First, we have made significant advances in the production of our first Lilium jets.***  At the end of 2023, the Lilium jet program hit an historic milestone with the delivery to the company's production facilities outside Munich of the first Lilium jet fuselage.  Soon after, Lilium completed the first join of fuselage wing and canards.  ***During the first quarter of 2024, major aircraft structures and systems continued to arrive at Lilium from our suppliers, enabling Lilium to advance aircraft build and verify quality and interfaces for the first set of Lilium jets.***

*     *     *

<Klaus Roewe>

***Lilium's avionics system integration test rig, developed and built by Honeywell, is now successfully running at the Lilium headquarters campus***.  The test rig, one of the main assets of Lilium system integration testing, combines all avionic units and software required for delivering the Lilium jet's core avionics functions, communication navigation, autopilot, maintenance, flight recording and indication.

*     *     *

<Klaus Roewe>

***Number four, we are growing our order book.  On the commercial front, the Lilium jet order pipeline continues to grow increasingly with firm orders that include pre-delivery payments.  In total, Lilium now has an order pipeline of over 780 Lilium jets, including binding orders and MOU agreements from operators inside the United States, South America, Europe, Asia, and the Middle East.***  Customers love the look of the aircraft, the superior spacious cabin, as well as the estimated range and unit economics.  ***Visibly provided by EASA on applicable safety standards and the Lilium jet's path to certification are also supporting our global sales effort.***

*     *     *

<Johan Malmqvist>

So now to our funding and finance highlights.  During the past couple of months, we have made ***significant progress on our fundraising efforts,*** primarily on three fronts.  First, we recently concluded a $114 million gross proceeds capital raise backed by both new and existing investors.  Our largest shareholder Tencent continues to be supportive and participated in the latest round.

13

Second, we have made a significant advance in our funding discussions with our home state of Bavaria and the German government.  They have commissioned the German State Bank, KFW, to conduct a diligence on Lilium as part of the customary investment process.  ***Once the diligence is completed, Lilium expects to receive state guarantees as security for a loan from the German State Bank, most likely in the form of a convertible note***.  We expect the funding amount of around EUR100 million and that the diligence will take around six to eight weeks to complete.

***Finally, we advanced discussions with President Macron's administration towards a French government guarantee-backed loan, which would be non-dilutive***.  We estimate the overall funding support will be around EUR200 million with disbursements over several years.  We plan to use the funding to build high-volume production facilities in France, including final assembly line, battery pack assembly line, and maintenance facilities.  ***This planned capacity expansion is already taking into consideration in our business plan***.

\*     \*     \*

**\<Johan Malmqvist\>**

***Furthermore, we believe that customary pre-delivery payments will provide an additional support around our longer-term funding plan***.  Lilium continues to engage in active dialogue with sovereign entities, strategic partners, prospective customers, and stakeholders for further funding initiatives.

\*     \*     \*

**\<Klaus Roewe\>**

As you can see, ***we continue to deliver our key milestones as we progress to our manned first flight target to occur in late 2024 and entry into service targeted for 2026***.  We are well into our assembly of our first Lilium jet and will be keeping the market abreast on the program over the course of the year.

***On the commercial front, the superior expected performance unit, economics and comfort provided by the Lilium jet has resulted in a firm 56 orders and we continue to convert MOUs into firm orders with pre-delivery payments.***  We hope to show you further progress on our ongoing discussions with airlines on feet orders in the coming months.

***On the financing front we have already begun receiving customary collection of pre-delivery payments in connection with pre-orders***. We are continuing through these final processes with the German and French governments and are also in discussions in other regions and countries on funding options. ***And most important to us on the financing front is that continued long-term support of our largest shareholders and suppliers as we progress to entry into service***.

31.     The above statements identified in ¶¶ 28-30 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.    Specifically, Defendants: (1) overstated the progress of the Company's fundraising activities; (2) overstated the likelihood and/or feasibility of obtaining sufficient funding to continue operations; (3) failed to disclose that the Company was experiencing issues with suppliers, including but not limited to Honeywell, which would likely result in a delay in the first Lilium Jet build and flight; (4) failed to disclose that, as a result of the first flight delay, the release of significant investment money and needed pre-order payments would not occur in 2024; (5) that, as a result of the foregoing, Defendants failed to sufficiently disclose the imminent insolvency of the Company and its subsidiaries; and, (6) failed to disclose that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

32.     On July 17, 2024, Lilium filed a report of foreign issuer on Form 6-K with the SEC signed by defendant Roewe, which touted, in part, the Company's recent capital raising activities (the "July Update").  Specifically, the July Update stated, in relevant part:

In May and June 2024, Lilium concluded a capital raise resulting in approximately $113 million of gross proceeds after giving effect to the final allocations.

\* \* \*

***Lilium expects to fund its ongoing operations until type certification and entry into service with existing cash on hand, non-dilutive methods of financing such as debt instruments, government support (including, as previously announced, potentially from the German and French governments) and pre-delivery payments from customers, among other non-dilutive methods, and also dilutive methods of financing such as the issuance of additional equity securities (including pursuant to facilities such as a standby equity purchase agreement or an equity line of credit) and potentially additional investments by existing shareholders.***

33.     The July Update also updated investors on the timing of the first flight, stating, in relevant part:

On July 17, 2024, Lilium N.V. ("Lilium") published a press release announcing that, based on a recent program review, its expected delivery schedule allowing first customer deliveries in 2026 is confirmed (subject to applicable regulatory certification requirements) and, *taking into account the testing and validation requirements needed prior to first manned flight, Lilium currently expects the first manned flight test of the Lilium Jet to occur in early 2025. This timing for the first manned flight test of the Lilium Jet, driven by the delivery of certain parts of flight-testing equipment, component parts of the aircraft, and software, is due to the indirect effects of ongoing industry-wide supply chain constraints. This timeline is not expected to have a material impact on customer deliveries, program planning, or total program costs.*

34.     Lilium also reaffirmed its target for customer deliveries and guidance and its testing, stating:

**Lilium Reaffirms 2026 Target for First Customer Deliveries and Provides Additional Detail on Testing Program.**

- First aircraft (Lilium Jet MSN 1) to be used exclusively for ground testing starting in a few weeks
- Second aircraft (Lilium Jet MSN 2) to be used for first manned flight in early 2025, will start ground testing in the fall, soon after MSN 1
- Three aircraft in production by year-end. Full structural aircraft for static tests available in fall
- Engineering simulator developed by FlightSafety International to be delivered early 2025
- Lilium prepares operational support with Flight Crew Training Simulator and Lilium POWER-ON, its support and services organization

**MUNICH, GERMANY, July 17, 2024:** Lilium (NASDAQ: LILM), a leading electric aircraft manufacturer and pioneer in Regional Air Mobility (RAM), today confirmed its delivery schedule allowing first customer deliveries in 2026 and provided additional program details.  This confirmation is based on a recent program review that considered the testing and validation requirements needed prior to first manned flight, which is now scheduled for early 2025, and the readiness of its support organization and training devices for its customers.

35.     The July Update attached as Exhibit 99.3 a presentation of the Company's

"*continued progress toward first flight and entry into service*" and in particular, the Company's

successful "***funding milestones***."  Specifically, the presentation touted the following, in relevant part:



36.      Missing from the disclosure in the July Update was the known reasons, and effect, that the delayed first flight date would have on the Company's prospects.  Specifically, at the time, Defendants knew that the Company had been having issues with its suppliers throughout 2024, including Honeywell, which were causing delays in building the Lilium Jet, and that the issues were specific to Lilium.  Lilium also knew, but failed to disclose, that delaying the first manned flight also meant a delay in the release of significant investment money and needed pre-order payments.

37.      According to CW1, a supply chain quality manager who worked at Lilium from December 2023 to February 2025, and reported to the Director of Supply Chain Procurement located in the United States, one of Lilium's biggest suppliers was Honeywell, and that Honeywell was supplying the "core thermal cooling unit" for the plane as well as the "core avionics suite." CW1 explained that the cooling unit provided air conditioning and kept the plane from

17

overheating, while the avionics suite included the electronic systems and software used to fly the plane.

38.     CW1 stated that throughout 2024 both systems from Honeywell had been continually delayed, and that these delays contributed to the first manned flight being delayed. CW1 further stated that supplier issues with other suppliers had been going on throughout 2024.

39.     CW1 stated that part of the supplier delays stemmed from the fact that Lilium was building a totally new type of plane, so the Company needed much more customized products. Due to Lilium's highly specialized requests, suppliers needed more time to design, produce and continually adjust the products in order to fit Lilium's needs.  This contradicted Lilium's public disclosure that the supply issues were "industry-wide".

40.     CW1's manager reported to Lilium's Vice President of Supply Chain, located in Germany, who reported to Yves Yemsi ("Yemsi"), Lilium's Chief Operating Officer until December 2024.  Yemsi reported to defendant Roewe.  According to CW1, based on conversations with co-workers and attendance at Company meetings, CW1 knew that Roewe was kept aware of the supplier issues that were delaying the plane's construction.  Roewe was briefed all the time, and he was very aware of the issues.

41.     CW1 also confirmed that getting the Lilium Jet to its first manned flight was a critical milestone for the Company.  The first flight was essential, according to CW1, because reaching that milestone not only meant attracting more investors, but also because it triggered the release of previously pledged investment money for the Company as well as additional payments on pre-orders of planes.

42.     It was explained to CW1, that when a customer placed an order for planes, the customer agreed to make a small up-front payment at the time, and then, once the Company

succeeded in a first flight, the customer paid a much larger amount as part of the pre-order. More importantly, CW1 understood that the previously pledged investment money would not be unleashed until after the first flight. CW1 recalled hearing that the amount of investment waiting to be unleashed after the first flight was about $50 million to $100 million.

43.     According to CW1, everyone at Lilium knew about the importance of getting the Company to its first flight because of its importance to fundraising for the Company. CW1 recalled discussions internally that reaching the first flight was most critical for the Company. CW1 also stated that Roewe knew about the importance of the first flight to funding, stating "there's no way he could not have known. His whole thing was about securing more funding."

44.     Defendants further failed to disclose that the Company's finances were in such dire straits that it had begun cutting funding of facility projects in order to focus solely on the first flight. According to CW2, an industrial engineer at Lilum's Germany headquarters from February 2024 to December 2024, who was responsible for overseeing facility construction projects at the Germany headquarters,[2] beginning in May or June of 2024, CW2 began to encounter resistance about paying for projects. When CW2 needed something, CW2 would "have to communicate with the finance department in terms of funding – do we have it or not." By May or June of 2024, CW2 began hearing the same refrain from the finance department: "We have no money for that (project) right now." More specifically, when CW2 spoke to a senior executive in the finance department about funding, CW2 was basically told "[w]e are running out of money, and we need now to be focused on what is needed for first flight."

---

[2] CW2 reported to the Team Lead of Facility Management and Engineering, who reported to the Head of Industrial Engineering.

45.     CW2 further explained that Lilium delayed projects, extended payments out, and in some cases, cancelled projects altogether.

46.     The above statements identified in ¶¶ 32-35 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants:  (1) overstated the progress of the Company's fundraising activities; (2) overstated the likelihood and/or feasibility of obtaining sufficient funding to continue operations; (3) failed to disclose that the Company had been experiencing issues with suppliers throughout 2024, including issues with Honeywell, which were specific to Lilium and not an "industry-wide supply chain constraint[]"; (4) failed to disclose that, as a result of the first flight delay, the release of significant investment money and needed pre-order payments would not occur in 2024; (5) that, as a result of the foregoing, Defendants failed to sufficiently disclose the imminent insolvency of the Company and its subsidiaries; and, (6) failed to disclose that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

47.     On September 30, 2024, Lilium filed a report of foreign issuer on Form 6-K with the SEC (the "2Q24 Financial Update") signed by defendant Roewe.  The 2Q24 Financial Update attached as Exhibit 99.1 to the Company's Unaudited Condensed Interim Financial Statements as of and for the six months ended June 30, 2024 ("Ex. 99.1").  The 2Q24 Financial Update attached as Exhibit 99.2 Management's Discussion & Analysis of Financial Condition and Results of Operations for the six months ended June 30, 2024 ("Ex. 99.2").  Ex. 99.1 of the 2Q24 Financial Update reported the Company's financial results, stating in relevant part:

> *The financial statements have been prepared on a basis that assumes the Group will continue as a going concern and which contemplates the realization of assets and satisfaction of liabilities and commitments in the ordinary course of business.*

*     *     *

As of the date of this report, existing investors have committed to provide additional funds in the aggregate amount of approximately €32 million to meet the immediate liquidity requirements of the Group and to contribute to the Minimum Funding Requirement.

\*       \*       \*

| In € thousand | June 30, 2024 | June 30, 2023 |
|---|---|---|
| **Finance income** | 108,806 | 3,021 |
| thereof: fair value changes | 106,587 | — |
| thereof: foreign currency exchange gains on financial instruments | 290 | 1,542 |
| thereof: impairment losses net of reversal | 57 | — |
| thereof: interest income | 1,872 | 1,479 |
| | | |
| **Finance expenses** | (8,488) | (258,739) |
| thereof: fair value changes | (968) | (258,337) |
| thereof: foreign currency exchange losses on financial instruments | (6,812) | — |
| thereof: interest portion of lease payments | (297) | (292) |
| thereof: impairment losses net of reversal | — | (29) |
| thereof: other interest expenses | (411) | (81) |
| | | |
| **Financial result** | 100,318 | (255,718) |

48.     Ex. 99.2 of the 2Q24 Financial Update touted the Company's "***Current Sources of Liquidity and Capital Resources,***" including that the Company had "***no substantial debt.***" Specifically, Ex. 99.2 stated in relevant part:

> ***As of June 30, 2024 and December 31, 2023, we had cash and cash equivalents and other financial assets of approximately €118.2 million and €203.1 million, respectively, and no substantial debt***. Our cash is mainly held at banks, on hand, or invested in short-term deposits or similar liquid assets. As of June 30, 2024 and December 31, 2023, other financial assets included our approximately €4.6 million investment in equity instrument.

49.     Ex. 99.2 of the 2Q24 Financial Update purported to warn of risks related to the Company's ability to continue as a going concern, and therein assured investors that "***approval is expected to be obtained within the next few weeks***" for certain loans from a German state development bank, and that "***management believes that the approval process will be finalized within the next few weeks and will have a positive outcome***." Ex. 99.2 further assured investors that "existing investors have committed to provide additional funds in the aggregate amount of

21

approximately €32 million to meet [ ] immediate liquidity requirements."  Specifically, Ex. 99.2

stated, in relevant part:

> **The financial statements have been prepared on a basis that assumes the Company and its consolidated subsidiaries (the "Lilium Group") *will* continue as a going concern** and which contemplates the realization of assets and satisfaction of liabilities and commitments in the ordinary course of business.

*     *     *

> Lilium's financing plan indicates that the Lilium Group requires additional capital immediately to continue to fund its ongoing operations.  Lilium is in advanced discussions regarding the provision of guarantees by the Federal Government of Germany and the Free State of Bavaria to allow for a €100 million convertible loan from a German state development bank (the "Government Convertible Loan").  The provision of such guarantees and the Government Convertible Loan are subject to an ongoing governmental approval process, which *approval is expected to be obtained within the next few weeks.  It is expected that a further three to five weeks would be required to complete and sign definitive documents and for Lilium to receive the first of two tranches of the Government Convertible Loan.  Based on the progress made to date, management believes that the approval process will be finalized within the next few weeks and will have a positive outcome*.  The funding of each of the two tranches of the Government Convertible Loan is expected to be subject to certain conditions precedent, including requirements that Lilium has received minimum commitments for additional funding from other investors (each, a "Minimum Funding Requirement").  Management expects that such financing will contain various operating covenants and governance rights.

> As of the date of this report, *existing investors have committed to provide additional funds in the aggregate amount of approximately €32 million to meet the immediate liquidity requirements* of the Group and to contribute to the Minimum Funding Requirement.

50.     The above statements identified in ¶¶ 47-49 were materially false and/or

misleading and failed to disclose material adverse facts about the Company's business, operations,

and prospects.   Specifically, Defendants:  (1) overstated the progress of the Company's

fundraising activities; (2) overstated the likelihood and/or feasibility of obtaining sufficient

funding to continue operations; (3) failed to disclose that the Company had been experiencing

issues with suppliers throughout 2024, including issues with Honeywell, which were specific to

Lilium and not an "industry-wide supply chain constraint[]"; (4) failed to disclose that, as a result

22

of the first flight delay, the release of significant investment money and needed pre-order payments would not occur in 2024; (5) that, as a result of the foregoing, Defendants failed to sufficiently disclose the imminent insolvency of the Company and its subsidiaries; and, (6) failed to disclose that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## C. End of the Class Period Disclosures

51. On October 24, 2024, before the market opened, Lilium disclosed that it had been unable to raise sufficient additional funds to continue the operations of the Company's principal operating wholly owned German subsidiaries, and that those subsidiaries would have to file for insolvency. Specifically, on that date, the Company filed a report of foreign issuer on Form 6-K with the SEC which stated, in relevant part:

> As previously reported, Lilium N.V. (the "Company" or "Lilium") has been engaged in fundraising initiatives to raise additional cash including from the German government and other sources. On October 17, 2024, Lilium received an indication that the budget committee of the parliament of the Federal Republic of Germany would not approve a €50 million guarantee of a contemplated €100 million convertible loan for Lilium from KfW. In addition, as of the date of this report, Lilium and the Free State of Bavaria have not reached an agreement in principle with respect to a guarantee of at least €50 million. ***Furthermore, despite its continuous and ongoing fundraising efforts, the Company has not been able to raise sufficient additional funds to continue the operations of Lilium GmbH and Lilium eAircraft GmbH, Lilium's principal operating wholly-owned German subsidiaries (the "Subsidiaries"). As a consequence, the managing directors of such Subsidiaries have determined that they are overindebted (Überschuldung) and are or will become unable to pay their existing liabilities due (Zahlungsunfähigkeit) within the next few days. The management of the Subsidiaries has informed the Company that they have to file for insolvency*** under German law and in doing so will apply for self-administration proceedings in Germany.
>
> ***Subject to certain limited exceptions, the Company will lose control of the Subsidiaries.*** We are in the process of analyzing the potential implications for the Company resulting from the insolvency proceedings of the Subsidiaries. This includes examining whether obligations exist under applicable insolvency law. The

23

management of Lilium N.V. is continuously reviewing whether there are grounds for its own insolvency as well and the result of any such review may be that Lilium N.V. files for regular insolvency proceedings as well.

52.     On this news, Lilium's stock price fell $0.33, or 61.6%, to close at $0.21 per share on October 24, 2024, on unusually heavy trading volume.  The Company's stock price continued to fall in the subsequent trading day, falling $0.06, or 28.8%, to close at $0.15 per share on October 25, 2024, on unusually heavy trading volume.

53.     Then, on November 4, 2024, before the market opened, the Company reported that, following the insolvency of the Company's subsidiaries, Lilium had not been able to raise sufficient additional funds to conduct its ongoing business consistent with past practice.  The Company disclosed that "funding for the Company is not feasible."  As a consequence, the Company would be "obliged to file for insolvency."  Specifically, on that date, the Company filed a report of foreign issuer on Form 6-K with the SEC which stated, in relevant part:

> On October 28, 2024, the Subsidiaries filed for insolvency under German law and applied for self-administration proceedings in Germany, which the court approved.
>
> Following the filing of a motion for opening of insolvency proceedings of the Subsidiaries the court has opened preliminary insolvency proceedings and has appointed a preliminary custodian to oversee the management of the Subsidiaries throughout the insolvency proceedings.
>
> *         *         *
>
> ***With respect to the Company, after continuing to investigate financing possibilities for the Company, Lilium has not been able to raise sufficient additional funds to conduct its ongoing business consistent with past practice. Financing and other strategic alternative options have been pursued without success and it has become apparent that funding for the Company is not feasible. As a consequence, the directors of Lilium have determined that a positive going concern no longer exists and the Company is therefore overindebted (Überschuldung) and is unable to pay its existing liabilities when due (Zahlungsunfähigkeit).  Against this background, the board of the Company is obliged to file for insolvency*** under German law without undue delay and in doing so will apply for regular insolvency proceedings in Germany soon.  Pursuant to Section 15a (1) Sentence 2 of the German Insolvency Code the application must be filed, at the latest, within three weeks in the case of a cash flow insolvency, and

24

within six weeks of the occurrence of over-indebtedness. As a result, the board of the Company has to cease all payments and deliveries which result in a diminution of the Company's assets except for payments and deliveries that are in line with due care of the business' obligations.

54. On this news, Lilium's stock price fell $0.015, or 15.5%, to close at $0.083 per share on November 4, 2024, on unusually heavy trading volume. The Company's stock price continued to fall in the subsequent trading day, falling $0.031, or 36.97%, to close at $0.052 per share on November 5, 2024, on unusually heavy trading volume.

**D. Lilium's Risk Disclosures Were Inadequate**

55. Throughout the Class Period, Lilium's risk disclosures failed to apprise investors of the serious financial distress the Company was facing and the imminency of bankruptcy if the German government failed to provide the anticipated guarantees. While Lilium disclosed financing risks, it omitted the truth that it was imminently running out of money and would be forced within days of the announcement from the German government that it would not provide a guarantee that it could no longer remain in business. Even with the many risk factors disclosed, investors were never informed of the Company's impending doom, although internally, according to CW2, Lilium employees were "super skeptical" that the German or Bavarian governments would aid the Company.

56. For example, Lilium's risk disclosure immediately below failed to adequately disclose that the Company had already lost the ability to access and utilize pre-delivery payments due to undisclosed supplier issues that were more than "industry-wide" supply chain issues, and that in addition to pre-delivery payments, additional investment money would be delayed, and that as a result bankruptcy was imminent.

> [W]e have included and intend to continue to include in our binding contracts. Any pre-delivery payments we receive would become available for our use towards the significant additional costs of securing Type Certification of the Lilium Jet. However, in some cases our ability to access and use pre-delivery payments to fund

25

our operations may be contingent upon the achievement of certain agreed milestones and customary financial thresholds. Our anticipated receipt of pre-delivery payments, and our ability to access and utilize such payments upon receipt to fund operations, is subject to several risks and uncertainties, many of which are out of our control and there can be no assurance that we will achieve the milestones and/or financial thresholds necessary to trigger pre-delivery payments becoming payable or accessible. In particular, to conduct our first manned test flight Lilium must apply for and obtain a permit from EASA and while we expect to obtain such permit in time to for the first manned test flight to occur in early 2025, there can be no assurances as to exactly when we will obtain such permit, if at all.

57.     Likewise, although Lilium stated that there were "no assurances" that the German and French governments would provide support, it failed to disclose that without the support Lilium would need to file for bankruptcy immediately. Each of the similarly vague disclosures such as "financing" being "[un]available to [Lilium] in a timely manner" and that the Company "might not have significant resources to conduct [its] business" failed to adequately inform investors. More specifically, those ambiguous disclosures failed to inform investors that as a result of the issues known to Defendants and discussed herein, Lilium would need to file for bankruptcy in mere months—it was not simply a possibility but a near certainty.

## V.     ADDITIONAL SCIENTER ALLEGATIONS

### A.     Actual Knowledge

58.     Each of the Individual Defendants acted with scienter, in that they knowingly or recklessly disregarded that the information disseminated to the public contained materially false and/or misleading information and omitted material adverse information as described above. Throughout the Class Period, the Individual Defendants acted intentionally or in such a deliberately reckless manner as to constitute a fraud upon Lead Plaintiff and the Class. Such actions caused the price of Lilium securities to be artificially inflated.

59.     In their respective roles as CEO and CFO of Lilium, the Individual Defendants were directly involved and participated in both the management and day-to-day operations of Lilium at

26

its highest levels.  Accordingly, the Individual Defendants each had access to specific information regarding Lilium's fund-raising efforts, cash and cash burn, and status of the assembly of the first Lilium Jet, generally and specifically.  The Individual Defendants were able to, and did, control the information disseminated to the investing public in the Company's various SEC filings, press releases, and other public statements during the Class Period.  As a result, each had the opportunity to falsify the information provided to the public regarding Lilium's business and performance.

60.     Defendants knew, or were reckless in not knowing, and intentionally or recklessly failed to disclose, no later than the beginning of the Class Period that:  (1) the progress of the Company's fundraising activities was overstated; (2) the likelihood and/or feasibility of obtaining sufficient funding to continue operations was grossly overstated; (3) the Company was experiencing issues with suppliers, including but not limited to Honeywell, which would likely result in a delay, and by July 2024 did result in a delay, in the first Lilium Jet build and flight; (4) as a result of the first flight delay, the release of significant investment money and pre-order payments would not occur in 2024; (5) as a result of the foregoing, Defendants failed to sufficiently disclose the imminent insolvency of the Company and its subsidiaries; and, (6) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

61.     Furthermore, in addition to publicly admitting knowledge as to fund-raising status and needs, cash and cash burn, and first flight status, *inter alia*, the Individual Defendants would have reasonably had access to reports and were involved in Company meetings where they were updated on crucial information indicating that the statements made herein were materially false and/or omitted material adverse facts.

27

### B. Admitted and Imputed Knowledge of Critical Facts

62. The false and misleading statements and omitted material adverse facts at issue herein relate to the Company's manufacturing and commercialization of its sole product and the cash needed to do so. Consequently, Defendants' scienter concerning such core operations may be reasonably inferred based on such, in addition to the following considerations.

63. Because the Individual Defendants were the CEO and CFO of the Company during the Class Period, they had day-to-day operational control over and thorough knowledge of the Company's only product and related fund-raising needs. Defendants Roewe and Malmqvist also repeatedly admitted to having knowledge of Lilium's progress with fund-raising, cash and cash burn, and the Lilium Jet's manufacturing and first flight status during the Class Period in connection with SEC filings, press releases and investor calls.

64. For example, during the 1Q24 Earnings Call, defendant Roewe stated: "In total, Lilium now has an order pipeline of over 780 Lilium jets, including binding orders and MOU agreements from operators inside the United States, South America, Europe, Asia, and the Middle East." He continued with detail such as: "Lilium's avionics system integration test rig, developed and built by Honeywell, is now successfully running at the Lilium headquarters campus." *See also* ¶ 30.

65. Defendant Malmqvist added details on the same call, stating, for example: "we recently concluded a $114 million gross proceeds capital raise" and that Lilium expects "the funding amount of around EUR100 million [from the German State Bank] and that the diligence will take around six to eight weeks to complete." *See also* ¶ 30.

### C. Temporal Proximity of Misrepresentation and Disclosure

66. On September 30, 2024, Lilium filed the 2Q24 Financial Update with the SEC, signed by defendant Roewe, which attached the Company's Unaudited Condensed Interim

28

Financial Statements and the MD&A for the six months ended June 30, 2024, wherein it was stated, *inter alia*, that "existing investors have committed to provide additional funds . . . to meet the immediate liquidity requires of the Group" and that the Company had "cash and cash equivalents and other financial assets of approximately €118.2 million and €2031. Million, respectively, with no substantial debt." Less than four weeks later, on October 24, 2024, Defendants filed a Form 6-K with the SEC that stated that the "company has not able to raise sufficient additional funds to continue the operations of [its operating subsidiaries]" and that the subsidiaries were "overindebted" and "unable to pay their existing liabilities due . . . within the next few days." A strong inference of scienter is raised by the temporal proximately of the false misrepresentation and disclosure.

### D. Motive and Opportunity

67. The Individual Defendants were motivated to make false and misleading statements and conceal material adverse facts regarding Lilium's fund-raising efforts, cash and cash burn, and commercialization issues, in order to capitalize on their outsized compensation.

68. According to *Simply Wall St.*,[3] defendant Roewe's compensation for 2023 was €1.79 million, or $1.95 million, comprised of 33% salary and 67% bonus, which was above average for companies of similar size in the UK market. Notably, Roewe's salary also increased while the Company was unprofitable.

69. Malmqvist's compensation information is unavailable, but upon information and belief, it is believed to be equally above average as compared to similar sized companies.

---

[3] https://simplywall.st/stocks/us/capital-goods/otc-lilm.f/lilium/management

### E.      Corporate Scienter

70.      The Individual Defendants were responsible for signing SEC filings and the shareholder letter.  The Individual Defendants acted with apparent authority to speak on behalf of the Company and their statements were made with the imprimatur of the Company that selected them to speak on its behalf.  Moreover, as CEO and CFO, the Individual Defendants were highly involved in the preparation, review, finalization, and issuance of the Company's press releases and financial statements, and investors relied on their honesty and integrity.

71.      Based on the foregoing, the Individual Defendants' actions and scienter are imputable to Lilium at all times during the Class Period.  Each of the Individual Defendants acted as an agent of Lilium both with respect to SEC filings they signed and also with respect to the SEC filings and earnings releases that they assisted in preparing and/or that they oversaw or participated in the accounting for.  Therefore, the Individual Defendants' states of mind are imputable to Lilium for all of the challenged statements in this Complaint, whether or not they personally signed those statements.

## VI.      UNDISCLOSED ADVERSE FACTS

72.      The market for Lilium's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Lilium's securities traded at artificially inflated prices during the Class Period.  Lead Plaintiff and other members of the Class purchased or otherwise acquired Lilium's securities relying upon the integrity of the market price of the Company's securities and market information relating to Lilium, and have been damaged thereby.

73.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Lilium's securities, by publicly issuing false and/or misleading statements

and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Lilium's business, operations, and prospects as alleged herein.

74. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Lilium's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## VII. LOSS CAUSATION

75. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

76. During the Class Period, Lead Plaintiff and the Class purchased Lilium's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

31

77.     The artificial inflation created by Defendants' misrepresentations and omissions was partially removed when on October 24, 2024, before the market opened, the Company disclosed that it has been unable to raise sufficient additional funds to continue operations of the Company's principal wholly owned German subsidiaries.  This announcement caused Lilium's share price to decline $0.33 per share, or 61.6%, on heavier than usual trading volume.  Lilium's stock price continued to decline in the subsequent trading day, falling $0.06 per share, or 28.8%, to close at $0.15 per share on October 25, 2025, on heavier than usual trading volume.

78.     Despite the significant decline in the price of Lilium stock, the price remained artificially inflated as Defendants continued to mislead the market.

79.     On November 4, 2024, before the market opened, the Company reported that, following the insolvency of the Company's subsidiaries, Lilium had not been able to raise sufficient additional funds to conduct its ongoing business consistent with past practice.  The Company disclosed that "funding for the Company is not feasible."  As a consequence, the Company would be "obliged to file for insolvency."

80.     On this news, Lilium's stock price fell $0.015, or 15.5%, to close at $0.083 per share on November 4, 2024, on unusually heavy trading volume.  The Company's stock price continued to fall in the subsequent trading day, falling $0.031, or 36.97%, to close at $0.052 per share on November 5, 2024, on unusually heavy trading volume.

81.     The timing and magnitude of the price decline in Lilium's stock on the dates of the disclosures above negates any inference that the losses suffered by Lead Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry facts, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## VIII.   CLASS ACTION ALLEGATIONS

82.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Lilium securities between June 11, 2024 and November 3, 2024, inclusive, and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

83.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lilium's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Lilium shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Lilium or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

84.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

85.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

33

86.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b.     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Lilium;

    c.     whether Defendants acted knowingly or recklessly in issuing false and misleading statements (or omissions);

    d.     whether the prices of Lilium securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

    e.     to what extent the members of the Class have sustained damages and the proper measure of damages.

87.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.     APPLICABILITY PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

88.     The market for Lilium's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to

disclose, Lilium's securities traded at artificially inflated prices during the Class Period.  On July 16, 2024, the Company's share price closed at a Class Period high of $1.02 per share.  Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Lilium's securities and market information relating to Lilium and have been damaged thereby.

89.     During the Class Period, the artificial inflation of Lilium's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Lead Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Lilium's business, prospects, and operations, causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

90.     At all relevant times, the market for Lilium's securities was an efficient market for the following reasons, among others:

a.     Lilium shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.     As a regulated issuer, Lilium filed periodic public reports with the SEC and/or the NASDAQ;

c.     Lilium regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases

on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

    d.  Lilium was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

91.  As a result of the foregoing, the market for Lilium's securities promptly digested current information regarding Lilium from all publicly available sources and reflected such information in Lilium's share price. Under these circumstances, all purchasers of Lilium's securities during the Class Period suffered similar injury through their purchase of Lilium's securities at artificially inflated prices and a presumption of reliance applies.

92.  A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.     NO SAFE HARBOR

93.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

94.     In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

95.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward- looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Lilium who knew that the statement was false when made.

### FIRST CLAIM

#### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
#### Against All Defendants

96.     Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

97.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Lilium's securities at artificially inflated

37

prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

98.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Lilium's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

99.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Lilium's financial well-being and prospects, as specified herein.

100.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Lilium's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Lilium and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

101.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts:  (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

102.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Lilium's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

103.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Lilium's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Lilium's securities during the Class Period at artificially high prices and were damaged thereby.

104.    At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Lilium was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Lilium securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

105.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

106.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

107.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

108.    The Individual Defendants acted as controlling persons of Lilium within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

109.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

110.    As set forth above, Lilium and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of

41

the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated:  March 26, 2025                      Respectfully submitted,

**LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP**

*/s/ Jeffrey C. Schneider*
Jeffrey C. Schneider (Florida Bar No. 933244)
Miami Tower
100 SE 2nd Street, 36th Floor
Miami, FL  33131
Telephone:  (305) 403-8788
Facsimile:  (305) 403-8789
Email:  jcs@lklsg.com
Secondary: ph@lklsg.co

42

*Liaison Counsel for TLP One LLC and the Proposed Class*

**BRAGAR EAGEL & SQUIRE, P.C.**
Lawrence P. Eagel (admitted *pro hac vice*)
Marion C. Passmore (*pro hac vice* forthcoming)
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone:  (212) 308-5858
Facsimile:  (212) 214-0506
Email:  eagel@bespc.com
         passmore@bespc.com

*Lead Counsel for TLP One LLC and the Proposed Class*

43

## CERTIFICATE OF SERVICE

I, Jeffrey C. Schneider, hereby certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this 26th day of March, 2025.

*/s/ Jeffrey C. Schneider*
Jeffrey C. Schneider
